STATE OF NORTH CAROLINA v. SHELTON LAMAR SAPP

No. COA07-1135

(Filed 3 June 2008)

**1. Rape— two first-degree rapes—switched positions—sufficiency of evidence**

The trial court did not err by submitting two first-degree rape charges to the jury even though defendant contends he did not "finish" having sex with the victim on the couch but merely switched positions by moving to the floor because: (1) each act of forcible vaginal intercourse constitutes a separate rape; (2) although the victim did not specifically articulate that defendant

withdrew, her testimony that he did not "finish" on the couch but that the two "had sex, again" on the floor was substantial evidence from which the jury could infer that the defendant withdrew before re-penetrating the victim on the floor; (3) defendant acknowledged that he was not sure how many times he raped the victim; and (4) when viewed in the light most favorable to the State, defendant's testimony and the testimony of the victim constitute substantial evidence of two rapes including one on the couch and one on the floor.

**2. Rape— first-degree rape—acting in concert—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the first-degree rape charge resulting from the acts of a coparticipant in the bathroom with the victim on the theory of acting in concert where the evidence at trial showed that: (1) a coparticipant and defendant invaded the victims' residence with the intent to commit robbery with a dangerous weapon; (2) defendant's rapes of the female victim in front of her boyfriend was for the admitted purpose of coercing the boyfriend to give up his money and drugs, and, as such, they were part of the robbery; (3) once defendant had engaged in this conduct in front of the coparticipant, it was foreseeable that the coparticipant would become aroused and want to have sex with the victim; and (4) having set in motion the rape of the victim as an integral part of the robbery, defendant cannot now complain that the coparticipant's rape of the victim was not a natural and probable consequence of the home invasion and robbery.

**3. Kidnapping— second-degree kidnapping—young children—sufficiency of evidence—restraint—confinement**

The trial court did not err by denying defendant's motion to dismiss the three second-degree kidnapping charges involving the young children even though defendant contends the children were neither restrained nor confined where the evidence at trial showed that: (1) defendant, wielding a shotgun, acted in concert with a coparticipant to isolate the grandmother, the female victim's 12-year-old brother, and three young children in a single bedroom while terrorizing the remaining occupants of the apartment in the course of a robbery; (2) defendant controlled the behavior of the persons in the bedroom by forcing both women to remove their clothes and refusing to allow the grandmother to use the bathroom when she asked to do so, telling her to "pee on

the floor;" and (3) the intruders terrorized those in the bedroom, responding to the 12-year-old brother by hurling racial slurs and telling him to "shut up."

**4. Kidnapping— second-degree—instruction—restraint**

The trial court did not err by instructing on a theory of restraint for second-degree kidnapping because: (1) there was substantial evidence from which the jury could infer that the defendant exercised impermissible control over the inhabitants of the bedroom sufficient to withstand a motion to dismiss the second-degree kidnapping charges related to the young children; and (2) the instruction on restraint was supported by substantial evidence that defendant, wielding a shotgun, terrorized the occupants of the apartment and exercised control over the persons in the bedroom by use of threats.

**5. Sentencing— felony structured sentencing—prior conviction in Virginia substantially similar to N.C. crime**

The trial court did not err by concluding the State met its burden of proving that defendant's prior conviction in Virginia was substantially similar to a Class A1 or Class 1 misdemeanor in North Carolina for felony structured sentencing purposes because: (1) the State introduced the petition, indictment, and judgment from the Commonwealth of Virginia against defendant for inflicting bodily injury on an employee of a juvenile detention center, and after discussing with counsel for the State and defendant whether the offense was similar to the North Carolina crimes of assault inflicting serious injury or assault on a government official, the court concluded that the offense was at least a Class 1 misdemeanor, revised the Sentencing Worksheet to reflect one point instead of two, and found defendant to be a Prior Record Level II offender; (2) although the Virginia statute does not contain the precise wording found in N.C.G.S. § 14-33(c), the requirement set forth in N.C.G.S. § 15A-1340.14(e) is not that the statutory wording precisely match, but rather that the offense be "substantially similar;" (3) the Virginia statute makes it a crime for persons confined in a correctional facility to knowingly and willfully inflict bodily injury upon an employee of that facility, and due to the nature of a correctional facility, an assault on one of its employees would necessarily be in the discharge of the employee's duties; and (4) any questions as to whether this was the case were resolved by the defendant's own testimony that the assault occurred as the employee at-

tempted to break up a fight between prisoners and prevent them from further fighting.

## 6. Homicide— first-degree murder—short-form indictment— constitutionality

Our Supreme Court has on numerous occasions upheld the constitutionality of the use of a short-form indictment for the charge of first-degree murder.

Appeal by defendant from judgment entered 28 July 2006 by Judge Albert Diaz in Mecklenburg County Superior Court. Heard in the Court of Appeals 6 March 2008.

*Attorney General Roy Cooper, by Special Deputy Attorney General Norma S. Harrell, for the State.*

*Russell J. Hollers, III, for the defendant-appellant.*

STEELMAN, Judge.

Defendant's acts of withdrawal and moving a female victim from the couch to the floor established that there was a separate penetration supporting a second rape charge. When defendant raped one of the victims twice during the course of a home invasion and robbery, a third rape by his co-defendant was a natural or probable consequence of the robbery and the trial court properly submitted the third rape to the jury under an acting in concert theory. Evidence that young children were confined to a bedroom while defendants terrorized the family during the course of a robbery was sufficient to withstand defendant's motion to dismiss second-degree kidnapping charges on the elements of confinement and restraint and to warrant a jury instruction on both theories. The trial court properly found that defendant's conviction in Virginia was for a crime substantially similar to a North Carolina Class A1 misdemeanor.

### I. Factual and Procedural Background

In the early morning hours of 18 August 2002, two men entered a residence in Charlotte in search of money and drugs belonging to Damien Bell (hereinafter "Bell"). The apartment belonged to Bell's girlfriend, L.B., whose 48-year-old mother and 12-year-old brother were staying with the couple and L.B.'s three young children (ages 6, 3, and 5 months). The intruders, Shelton L. Sapp (defendant) and Tracy Hicks (hereinafter "Hicks"), armed with a shotgun and a knife respectively, entered through a bedroom window, where they found

L.B.'s mother and 12-year-old brother asleep. They forced these two persons through the hall into the second bedroom, where Bell, L.B., and the younger children slept.

The intruders used duct tape to bind Bell and demanded cash and illegal drugs that they suspected were located in the residence. As the intruders searched for the cash and drugs, they forcibly separated Bell and L.B. from the rest of the family. L.B.'s mother, her 12-year-old brother, and the three young children remained in the bedroom throughout the incidents hereinafter described, while the intruders verbally and physically terrorized Bell and L.B.

Both intruders forced L.B. to engage in sexual intercourse: first, defendant in the living room, and later, Hicks in the apartment's lone bathroom. Defendant testified that he had sex with L.B. in order to induce Bell to reveal the location of the money and drugs. Hicks did not testify. Defendant took L.B. into the living room, where he twice penetrated her vaginally: first on the couch then again on the floor, while Bell and Hicks watched. Defendant then sent L.B. to the bathroom with instructions to "wash really good." After she bathed, and was in the process of drying herself, Hicks came into the bathroom and had intercourse with her.

Eventually, Bell told the men where to find the money and drugs. Defendant retrieved the money and drugs from their hiding place in a bedroom closet, then made a phone call. Before leaving, defendant killed Bell with a single shot to the head.

On 13 January 2003, defendant was indicted for murder, first degree burglary, first degree rape (3 counts), first degree kidnapping (2 counts), and second degree kidnapping (5 counts). Defendant was tried capitally on the murder charge. The offenses were consolidated for trial before a jury at the 26 June 2006 criminal term of Mecklenburg County Superior Court. Defendant's motion to dismiss the charges at the close of the State's evidence was denied. Defendant then testified and admitted to raping L.B. and shooting Bell. Defendant testified that he only raped L.B. once and did not plan any crime other than the robbery. On cross-examination, the State questioned defendant concerning his statement to police investigators that "My only plan was to go in, boom, boom." Defendant's motion to dismiss all charges at the close of all evidence was denied.

On 21 July 2006, the jury returned a verdict of guilty on all charges. On 28 July 2006, the jury recommended life imprisonment rather than death on the murder charge. The trial court accordingly

sentenced defendant to life imprisonment for the murder charge, and consecutive active sentences totaling a minimum of 1,369 months and a maximum of 1,764 months imprisonment for the other offenses. Defendant appeals.

## II. Denial of Defendant's Motions to Dismiss

In his first three arguments, defendant contends that the trial court erred in denying his motions to dismiss two of the rape charges and three of the second degree kidnapping charges.

### A. Standard of Review

When considering a criminal defendant's motion to dismiss, the trial court must view all of the evidence presented in the light most favorable to the State, and the State is entitled to all reasonable inferences which may be drawn from the evidence. The trial court correctly denies a motion to dismiss if there is substantial evidence of every element of the offense charged, or any lesser offense, and of defendant being the perpetrator of the crime.

*State v. Murray,* 154 N.C. App. 631, 634, 572 S.E.2d 845, 847 (2002) (internal quotations and citations omitted).

"Whether the evidence presented is substantial is a question of law for the court." *Id.* at 734, 572 S.E.2d at 847 (citation omitted). "Evidence is substantial if it is relevant and adequate to convince a reasonable mind to accept a conclusion." *Id.* (quoting *State v. Robinson,* 355 N.C. 320, 336, 561 S.E.2d 245, 255 (2002), *cert. denied,* 537 U.S. 1006, 154 L. Ed. 2d 404 (2002)). This Court reviews such questions of law *de novo.*

### B. The Rape Charges

### 1. The Living Room Rapes

[1] In his first argument, defendant contends that he committed only one rape on L.B. because he did not "finish" having sex with her on the couch, but merely switched positions by moving to the floor. We disagree.

Defendant relies on *State v. Small,* 31 N.C. App. 556, 559, 230 S.E.2d 425, 427 (1976), for the premise that an act "of rape is terminated by a single act or fact." This reliance is misplaced. In *State v. Key,* this Court upheld separate convictions for rape where defendant did not move the victim from one location to another but forced her to change positions before re-entering her. *State v. Key,* 180 N.C. App.

286, 289, 636 S.E.2d 816, 820 (2006) (affirming two rape convictions where defendant penetrated victim vaginally from the front, withdrew, turned her on her side, and re-penetrated the victim vaginally from the rear), *disc. review denied*, 361 N.C. 433, 649 S.E.2d 399 (2007). "Each act of forcible vaginal intercourse constitutes a separate rape. Generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense." *Key*, 180 N.C. App. at 288, 636 S.E.2d at 819 (2006) (quoting *State v. Owen*, 133 N.C. App. 543, 551-52, 516 S.E.2d 159, 165 (1999)).

Viewed in the light most favorable to the State, the evidence showed that the defendant and Hicks broke into the victim's home in the middle of the night and terrorized her and her family. After beating her boyfriend in an attempt to find money and drugs, defendant, armed with a shotgun, took L.B. to the living room with the stated purpose of having sex. L.B. testified that defendant penetrated her twice, first on the couch in the living room, then on the floor after Hicks dragged Bell, with his mouth taped and hands bound, into the room to watch.

The victim's testimony included the following:

Q. What happened to you on that couch, [Ms. B.]?

A. Well, I had sex with the tall guy—the tall guy with the shotgun.

Q. When you say sex, what do you mean?

A. Intercourse.

Q. Okay. And, you mean he put his penis in your vagina?

A. Yes, sir.

Q. [Ms. B.], did you give that man permission or did you want to have sexual intercourse with him there on your couch?

A. No, sir.

Q. Why did you do it?

A. I was afraid.

. . .

Q. And, did the man, the tall man with the shotgun, did he finish having sexual intercourse with you, there on the couch?

A. No, sir.

. . .

Q. . . . What happened . . . once the shorter man brought [Bell] into the living room where you and the tall man with the shotgun were?

A. Well, we got on the floor; me and the tall guy got on the floor. He got on top of me and we had sex, again.

. . .

Q. . . . did you give that man permission for—did you want to have sexual intercourse with him at that time?

A. No, sir.

Although L.B. did not specifically articulate that the defendant withdrew, her testimony that he did not "finish" on the couch but that the two "had sex, again" on the floor was substantial evidence from which the jury could infer that the defendant withdrew before re-penetrating the victim on the floor. *Robinson*, 355 N.C. at 336, 561 S.E.2d at 255-56.

Defendant acknowledged that he was not sure how many times he raped the victim. On direct examination, defendant testified:

Q. Did you have sex with her, in the living room?

A. Yeah. I did.

Q. Why did you do it?

A. **I don't know how many times.** I done thought about this right here, man.

(emphasis added). Defendant testified that his motive in "having sex" with the victim was to apply pressure to Bell to reveal where the money and drugs were hidden.

When viewed in the light most favorable to the State, defendant's testimony and the testimony of the victim constitute substantial evidence of two rapes: one on the couch and one on the floor. The act of withdrawal and moving with the victim to the floor was sufficient to sustain the second charge. *Key*, 180 N.C. App. at 289, 636 S.E.2d at 820. Thus, the trial court did not err in denying defendant's motion to dismiss at the close of all the evidence or in submitting both rape charges to the jury.

This argument is without merit.

## B.  Rape in the Bathroom

[2]  In his second argument, defendant contends that the court erred in denying his motion to dismiss the rape charge resulting from the acts of Hicks in the bathroom because the evidence did not support a rape conviction on an acting in concert theory. We disagree.

> [I]f two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose; that is, the common plan to rob, or as a natural or probable consequence thereof.

*State v. Westbrook*, 279 N.C. 18, 41-42, 181 S.E.2d 572, 586 (1971) (quoted with approval in *State v. Barnes*, 345 N.C. 184, 233, 481 S.E.2d 44, 71 (1997); *State v. Erlewine*, 328 N.C. 626, 637, 403 S.E.2d 280, 286 (1991)), *sentence vacated on other grounds*, 408 U.S. 939, 33 L. Ed. 2d 761 (1972). "A natural consequence is thus one which is within the normal range of outcomes that may be expected to occur if nothing unusual has intervened." *State v. Bellamy*, 172 N.C. App. 649, 669, 617 S.E.2d 81, 95 (2005) (quoting *Roy v. United States*, 652 A.2d 1098, 1105 (D.C. 1995)), *disc. review denied, appeal dismissed*, 360 N.C. 290, 628 S.E.2d 384 (2006).

Defendant argues that, under *Bellamy*, the bathroom rape was not a natural or probable consequence of the robbery. He contends that, as the man with the gun, he was "in charge of the situation" and it was unforeseeable that Hicks "would defy him by raping [L.B.]." He further contends that once that he told L.B. to go wash herself that the actions of Hicks were no longer a natural or probable consequence of the robbery and that he cannot be convicted under an acting in concert theory.

In *Bellamy*, two men planned a robbery of a restaurant where one of the men was employed. Bellamy entered the office area of the restaurant shortly after closing. He confronted the night manager with a gun as she prepared the night deposit. After securing the money, Bellamy instructed the manager to disrobe. He demanded that she spread her labia, then used the barrel of the gun to further separate her labia. The assault followed the robbery. There was no evidence of any plan for a sexual assault, nor was there evidence that the sexual assault was related in any way to the robbery. The State argued that, as a party to the robbery, Bellamy's co-defendant was "liable as a principal under the theory of acting in concert for

Bellamy's sexual assault on C.B." The issue before this Court was whether "a sexual assault is a natural or probable consequence of a robbery with a dangerous weapon of a fast food restaurant[.]" *Bellamy*, 172 N.C. App. at 668, 617 S.E.2d at 94.

In reaching its conclusion that this unusual sexual assault was not a natural or probable consequence of the completed robbery, this Court stated:

> Our Supreme Court has expressly rejected the concept that for a defendant to be convicted of a crime under an acting in concert theory, he must possess the *mens rea* to commit that particular crime. *Barnes*, 345 N.C. 184, 481 S.E.2d 44 (overruling *State v. Blankenship*, 337 N.C. 543, 447 S.E.2d 727 (1994) and *State v. Straing*, 342 N.C. 623, 466 S.E.2d 278 (1996)). Based upon the holding in *Barnes*, it would not be appropriate to adopt a standard based upon the defendant's subjective state of mind or intent. Rather, the appropriate standard for evaluating whether a crime was a reasonable or probable consequence of a defendant's joint purpose should be an objective one.
>
> We decline to adopt a *per se* rule that any sexual assault committed during the course of a robbery is a natural or probable consequence of a planned crime. Rather, this determination must be made on a case by case basis, upon the specific facts and circumstances presented. *See State v. Trackwell*, 458 N.W.2d 181, 183-84 (Neb. 1990).

*Bellamy*, 172 N.C. App. at 668-69, 617 S.E.2d at 95. The Court held that this "bizarre sexual offense" was not a natural and probable consequence of the robbery. *Id.* at 670-71, 617 S.E.2d at 96.

Citing to the case of *People v. Nguyen*, 21 Cal. App. 4th 518, 532-33, 26 Cal. Rptr. 2d 323, 332 (Cal. App. 3 Dist. 1993), this Court analyzed the foreseeability of a sexual assault occurring in the context of a commercial setting, as opposed to a residential setting. *Bellamy*, 172 N.C. App. at 669-70, 617 S.E.2d at 95-96. We held that it was less likely that a sexual assault in the course of a robbery of a business would be a natural and probable consequence than in the context of a residential robbery. *Id.* at 670, 617 S.E.2d at 96.

Viewed in the light most favorable to the State, the evidence at trial showed that Hicks and defendant invaded the victims' residence with the intent to commit robbery with a dangerous weapon. Defendant's rapes of L.B. in front of Bell were for the admitted pur-

pose of coercing Bell to give up his money and drugs, and, as such, they were part of the robbery. Once defendant had engaged in this conduct in front of Hicks it was clearly foreseeable that Hicks would become aroused and want to have sex with L.B. Having set in motion the rape of L.B. as an integral part of the robbery, defendant cannot now complain that Hicks' rape of L.B. was not a natural and probable consequence of the home invasion and robbery.

Unlike in *Bellamy*, where the sexual assault took place after the robbery was completed, the rape by Hicks was conducted during the course of the robbery. As noted in *Nguyen*, "[d]uring hostage-type robberies in isolated locations, sexual abuse of victims is all too common. . . . rapes in the course of a residential robbery occur with depressing frequency." *Nguyen*, 21 Cal. App. 4th at 532-33, 26 Cal. Rptr. 2d at 332 (internal quotations and citations omitted).

Taken in the light most favorable to the State, the evidence in this case supports the trial court's submission of the bathroom rape by Hicks to the jury under an acting in concert theory. We hold that, on these facts, Hicks' rape of L.B. was a natural and probable consequence of the intended robbery of Bell and the court did not err in submitting this rape charge to the jury.

This argument is without merit.

### C. Second Degree Kidnapping: The Children

[3] In his third argument, defendant contends that the court erred in denying his motion to dismiss the three second degree kidnapping charges involving L.B.'s young children, stating that, because the children were "neither restrained nor confined," the evidence was insufficient to submit these charges to the jury. We disagree.

Since 1975, the crime of kidnapping has been governed by statute. N.C.G.S. § 14-39 (2007) (defining kidnapping of a juvenile as the confinement, restraint or removal of the child, without the consent of the parent, for the purpose of, among other things, facilitating the commission of a felony).

In *State v. Shue*, this Court observed that:

"If the victim is shown to be under sixteen, the state has the burden of showing that he or she was unlawfully confined, restrained, or removed from one place to another without the consent of a parent or legal guardian." *State v. Hunter*, 299 N.C. 29, 40, 261 S.E.2d 189, 196 (1980).

"Confinement" in the context of the offense "connotes some form of imprisonment within a given area, such as a room, a house or a vehicle." *State v. Fulcher*, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978). Whereas " 'restrain,' while broad enough to include a restriction upon freedom of movement by confinement, connotes also such a restriction, by force, threat or fraud, without confinement." *Id.*

*State v. Shue*, 163 N.C. App. 58, 63, 592 S.E.2d 233, 237 (2004). Moreover, we believe that "The terms 'restrain,' 'confine' or 'remove' are related in that they all encompass an act which asserts control over the victim." *State v. Dominie*, 134 N.C. App. 445, 451, 518 S.E.2d 32, 35 (1999) (J. Walker, concurring).

Viewed in the light most favorable to the State, the evidence at trial showed that defendant, wielding a shotgun, acted in concert with Hicks to isolate L.B.'s mother, L.B.'s 12-year-old brother, and L.B.'s three young children in a single bedroom while terrorizing the remaining occupants of the apartment in the course of a robbery. There was evidence that defendant controlled the behavior of the persons in the bedroom by forcing both women to remove their clothes and refusing to allow L.B.'s mother to use the bathroom when she asked to do so, telling her to "pee on the floor." There was also evidence that the intruders terrorized those in the bedroom, responding to L.B.'s 12-year-old brother by hurling racial slurs and telling him to "shut up." We thus hold that there was substantial evidence from which the factfinder could infer that the defendant exercised impermissible restraint over the young children and confined them within the meaning of the statute. *Fulcher*, 294 N.C. at 523, 243 S.E.2d at 351; *Shue*, 163 N.C. App. at 63, 592 S.E.2d at 237.

This argument is without merit.

## II.  Jury Instructions on Second Degree Kidnapping Charges

**[4]** In his fourth argument, defendant alleges prejudicial error in that the jury was instructed on a theory of restraint without sufficient evidence to support that theory. We disagree.

The judge instructed the jury as to each child:

First, that the defendant, either acting alone or together with another, unlawfully confined [the child] within a given area or restrained him, that is restricted his freedom of movement.

Second, that [the child] had not reached his 16th birthday and his parent or guardian did not consent to this confinement or restraint. Consent obtained or induced by fraud or fear is not consent.

Third, that the defendant, either acting alone or together with another, confined or restrained [the child] for the purpose of committing the offenses of robbery with a dangerous weapon [sic].

And fourth, that this confinement or restraint was a separate, complete act, independent of and apart from the commission of the offense of robbery with a dangerous weapon.

Defendant challenges only the element of restraint in each paragraph, contending that: (1) *Fulcher* defined restraint as a constriction on one's freedom of movement by force, threat or fraud without confinement; (2) there was no evidence that defendant kept the children in the bedroom by force, threat or fraud; (3) the trial court should have refrained from charging the jury on the restraint theory; and (4) its failure to do so was prejudicial error because it prevented the jury from considering "whether staying with your grandmother in your bedroom, standing alone, constitutes kidnapping."

The language in *Fulcher* includes confinement within the meaning of restraint. *Fulcher*, 294 N.C. at 523, 243 S.E.2d at 351 ("The term 'restrain,' while broad enough to include a restriction upon freedom of movement by confinement, connotes also such a restriction, by force, threat or fraud, without a confinement."). We have already determined that there was substantial evidence from which the jury could infer that the defendant exercised impermissible control over the inhabitants of the bedroom, sufficient to withstand a motion to dismiss the second-degree kidnapping charges related to L.B.'s young children. We hold that the instruction on restraint was supported by substantial evidence that defendant, wielding a shotgun, terrorized the occupants of the apartment and exercised control over the persons in the bedroom by use of threats.

This argument is without merit.

### III.  Felony Sentencing Level

[5] In his fifth argument, defendant contends that the State failed to meet its burden of proving that defendant's prior conviction in Virginia was substantially similar to a Class A1 or Class 1 misdemeanor in North Carolina. We disagree.

**STATE v. SAPP**

[190 N.C. App. 698 (2008)]

At trial, the State introduced the petition, indictment, and judgment from the Commonwealth of Virginia against defendant for inflicting bodily injury on an employee of a juvenile detention center. After discussing with counsel for the State and defendant whether the offense was similar to the North Carolina crimes of assault inflicting serious injury or assault on a government official, the court concluded that the offense was "at least a Class 1 misdemeanor[,]" revised the Sentencing Worksheet to reflect one point instead of two, and found the defendant to be a Prior Record Level II offender. Defendant contends that, because the Virginia indictment did not allege that the victim was discharging or attempting to discharge any official duty, the State failed to prove that the assault was anything more than a simple assault, a Class 2 misdemeanor, and consequently he should have been found to be a Level I offender with no prior sentencing points.

N.C. Gen. Stat. § 15A-1340.14(e) governs the classification of prior convictions from other jurisdictions. The relevant portion of the statute reads:

> If the State proves by the preponderance of the evidence that an offense classified as a misdemeanor in the other jurisdiction is substantially similar to an offense classified as a Class A1 or Class 1 misdemeanor in North Carolina, the conviction is treated as a Class A1 or Class 1 misdemeanor for assigning prior record level points.

N.C. Gen. Stat. § 15A-1340.14(e) (2007).

The Virginia juvenile court petition charged that defendant:

> did on or about 11/29/99, unlawfully and feloniously, while confined in a secure facility as defined in VA. Code Section 16.1-228, knowingly and willfully inflict bodily injury on [D.R.], an employee thereof, in violation of Section 18.2-55 of the 1950 Code of Virginia as amended.

Section 18.2-55 of the Code of Virginia, "Bodily injuries caused by prisoners, state juvenile probationers and state and local adult probationers or adult parolees[,]" states that:

> A. It shall be unlawful for a person confined in a state, local or regional correctional facility as defined in § 53.1-1; in a secure facility or detention home as defined in § 16.1-228 or in any facility designed for the secure detention of juveniles; or while in the

custody of an employee thereof to knowingly and willfully inflict bodily injury on:

1. An employee thereof, . . .

Va. Code Ann. § 18.2-55 (2008).

Pursuant to defendant's guilty plea in Virginia, the court sentenced him to ten years imprisonment, with eight years and three months suspended.

During trial of the instant case, defendant testified that:

A. . . . I was in a juvenile correctional center . . . for like a couple of weeks and I caught an assault on an officer; in an assault on that officer.

[DEFENSE COUNSEL]. How did that happen?

A. One night, another inmate was in a block that we was in [sic] and it was only one officer working the unit [sic]. He came in to break the fight up and he tried to prevent both of us from fighting. In the process, he got assaulted. He got hit in the face. He pressed charges on me.

. . .

Q. . . . what happened as a result of that?

A. I got tried as an adult.

. . .

[DISTRICT ATTORNEY]. . . . . [T]he guard was a Mr. [D.R.]; wasn't it?

A. Yeah.

. . .

Q. . . . And the charge you were convicted of was called inflicting bodily injury; wasn't it?

A. I can't remember the exact charge; but some where around that [sic].

. . .

Q. . . . Inflict bodily injury, do you know if that's a felony?

A. I think so.

N.C. Gen. Stat. § 14-33(c) classifies the following conduct by a defendant as a Class A1 misdemeanor:

> . . . if, in the course of the assault, assault and battery, or affray, he or she:
>
> . . .
>
> (4) Assaults an officer or employee of the State or any political subdivision of the State, when the officer or employee is discharging or attempting to discharge his official duties[.]

N.C. Gen. Stat. § 14-33(c) (2007). The Virginia statute does not contain the precise wording found in N.C. Gen. Stat. § 14-33(c). However, the requirement set forth in N.C. Gen. Stat. § 15A-1340.14(e) is not that the statutory wording precisely match, but rather that the offense be "substantially similar." The Virginia statute makes it a crime for persons confined in a correctional facility to knowingly and willfully inflict bodily injury upon an employee of that facility. Due to the nature of a correctional facility, an assault on one of its employees would necessarily be in the discharge of the employee's duties. Any questions as to whether this was the case were resolved by the defendant's own testimony that the assault occurred as the employee attempted to break up a fight between prisoners and prevent them from further fighting. The trial court properly found defendant to be a Level II offender for felony structured sentencing purposes.

This argument is without merit.

## IV. Short Form Indictment

[6] In his final argument, defendant challenges the constitutionality of the short form murder indictment, contending that the trial court lacked subject matter jurisdiction to enter a judgment on first-degree murder because the short form indictment alleged only second degree murder. We disagree.

Defendant acknowledges that our Supreme Court has on numerous occasions upheld the constitutionality of the use of the short-form murder indictment, *e.g. State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593, *cert. denied*, 539 U.S. 985, 156 L. Ed. 2d 702 (2003) (rejecting the argument that the United States Supreme Court's decision in *Ring v. Arizona* rendered North Carolina's short-form murder indictment unconstitutional), and seeks only to preserve this issue in the event of further review. *Engle v. Isaac*, 456 U.S. 107, 71 L. Ed. 2d 783 (1982).

This argument is without merit.

### V. Conclusion

Defendant's brief addresses only six of nine original assignments of error. Pursuant to N.C. R. App. P. 28(b)(6) (2007), the remaining assignments of error are deemed to be abandoned.

For the reasons stated above, we find no error in the trial or sentencing of defendant.

NO ERROR.

Judges McCULLOUGH and ARROWOOD concur.