IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-1362

Filed: 17 March 2020

Clay County, No. 12 CRS 181

STATE OF NORTH CAROLINA

v.

JOHN D. GRAHAM

Appeal by defendant from judgment entered 13 December 2016 by Judge Eric Levinson in Clay County Superior Court and order entered 13 May 2019 by Judge Athena F. Brooks in Clay County Superior Court. Heard in the Court of Appeals 7 January 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Erin O'Kane Scott and Special Deputy Attorney General Benjamin O. Zellinger, for the State.*

*Appellant Defender Glenn Gerding, by Assistant Appellate Defender Daniel K. Shatz, for defendant.*

ARROWOOD, Judge.

John D. Graham ("defendant") appeals from judgment entered upon his conviction for sexual offense against a child under age thirteen and order denying his Motion for Appropriate Relief ("MAR"). We find no error in the jury trial phase of defendant's trial. However, we vacate the trial court's order imposing lifetime satellite-based monitoring ("SBM") upon defendant, with remand for the trial court to conduct an evidentiary hearing on its appropriateness pursuant to *Grady v. North*

*Carolina,* 575 U.S. 306, 191 L. Ed. 2d 459 (2015), and its progeny. Furthermore, we agree that the trial court's order denying defendant's MAR is insufficient, and vacate and remand for entry of an order not inconsistent with this opinion.

## I.  Background

### A.  Trial

On 11 September 2012, defendant was indicted on four counts each of engaging in a sexual act with a child under thirteen years of age and taking indecent liberties with a child. Defendant's case came on for trial in the criminal session of Clay County Superior Court before the Honorable Eric Levinson on 5 December 2016.

The State's key witness at trial was the alleged victim, A.M.D.[1] A.M.D.'s testimony was to the effect that defendant had touched the outside and inside of her vagina with his fingers on numerous occasions at four separate residences where she lived with her mother, Cassie D., over a period between one and two years. A.M.D. testified in greatest detail regarding defendant's sexual abuse of her at the residence referred to as "the Ruby Falls house." A.M.D. specifically mentioned three instances in which defendant inserted his finger into her vagina at the Ruby Falls house: on the couch in the living room while the family was watching television, on defendant's bed in the basement while her siblings were playing videogames in the same room, and in her own room while defendant read her a book. A.M.D. also mentioned telling

---

[1] Initials are used to protect the identity of the victim and for ease of reading.

her step-grandmother ("Ms. Hester") that defendant hurt her and gesturing toward her genitals when asked where.

The State also presented three witnesses who testified that A.M.D. had made consistent statements to them on prior occasions. John Tucker, P.A., ("Mr. Tucker") testified that, during his medical examination of A.M.D. in 2012, she told him that defendant hurt her and touched or penetrated her vagina "[w]ith his hand" "[m]ore than one time[,]" but did not "stick a stick inside" of her. A.M.D.'s brother T.D. testified that when he asked her if defendant ever molested her, "she said yes but she never gave the details."

Ms. Hester testified that when A.M.D. was visiting her on 30 May 2012, A.M.D. mentioned that defendant was her mother's boyfriend and was living with the family at the Ruby Falls house. A.M.D. told her that defendant "hurts" her, and when asked where, "she pointed to her private parts." Ms. Hester further testified that, around 2014, A.M.D. provided her with additional details on the molestation. Many of these additional details were consistent with A.M.D.'s trial testimony: "at the basement [of the Ruby Falls] house when they were watching TV . . . [defendant] would always touch her private parts and hurt her there[;]" that her "mommy was present" when defendant molested her while watching TV in the basement of the Ruby Falls house; and "that he used his fingers a lot with her private parts, placing them in her private parts."

However, some of A.M.D.'s prior statements offered by Ms. Hester involved matters to which she did not testify, such as that defendant "made he[r] put his private parts in her mouth and that he had choked her[,]" inserted objects into her private parts, and "had hurt her on her back side." Defense counsel objected to the first instance of such additional information. The trial court gave a limiting instruction that the prior statements could only be considered to assess the credibility of A.M.D.'s trial testimony and allowed questioning to proceed.

Detective Tony Ellis of the Clay County Sheriff's Department testified that he responded to the hospital on 2 June 2012 in response to a report of child molestation involving A.M.D. He set up a forensic interview for A.M.D. with a local child advocacy specialist on 4 June 2012. This interview was recorded and played for the jury. After ascertaining that the "Roger" A.M.D. alleged sexually abused her was defendant, Detective Ellis set about looking for him. Detective Ellis was unable to locate defendant at the residence of Cassie D., nor at any of his known prior addresses in North Carolina and Georgia. Detective Ellis then enlisted the help of the United States Marshals in locating defendant. After refreshing his recollection with the order for defendant's arrest, Detective Ellis testified that the Marshals subsequently returned defendant to the Clay County Sheriff's Department on 14 November 2012 and communicated to Detective Ellis that defendant had been apprehended and extradited from Puerto Rico.

At the close of its evidence, the State dismissed the four indecent liberties charges against defendant. Defendant's only witness was A.M.D.'s maternal aunt, Holly D. Holly D. testified that A.M.D. told her on two occasions that her accusations against defendant were false and that A.M.D. had falsely accused defendant because her stepmother Lora D. had threatened to kill her mother if she did not, and bribed her with a horse and other gifts if she did.

On 9 December 2016, the jury returned a verdict finding defendant guilty of one count of engaging in a sexual act with a child under thirteen years of age and not guilty of the remaining three counts of the same offense. The charge for which defendant was found guilty corresponded to the alleged events at the Ruby Falls house.

## B.     Sentencing

The trial court sentenced defendant on 13 December 2016. The court first set about calculating defendant's prior record level for the purpose of structured sentencing. The State introduced evidence of defendant's prior convictions from Georgia, including statutory rape and child molestation, thru a copy of his indictment and plea paperwork for the convictions. Though presented by the State and acknowledged by the court, a copy of the Georgia statute under which defendant had been convicted was never placed in the record.

After some discussion with counsel for defendant and the State, the court found that the Georgia statutory rape offense was substantially similar to North Carolina's own statutory rape law, which is a Class B1 felony. Thus, the court treated defendant's prior conviction as a Class B1 felony and assigned him nine prior record points. The court also assigned defendant one point for escaping the Clay County Detention Center while awaiting his trial, for a total of ten points corresponding to Prior Record Level IV. The court sentenced defendant to 335 to 462 months' imprisonment and ordered him to register as a sex offender upon his release.

Next, the court considered the State's proposed order subjecting defendant to North Carolina's SBM program for life after his release from prison. Counsel for defendant and the State agreed that the court was required to hold an evidentiary hearing, pursuant to *Grady v. North Carolina*, 575 U.S. 306, 191 L. Ed. 2d 459, at which the State must prove that it is reasonable to subject defendant to the SBM program for life. The State offered several times to proceed with such a hearing. The trial court ignored the State's offer to proceed introducing evidence in a *Grady* hearing. Rather, after taking notice of the facts adduced at trial, the court summarily gave its reasons for finding lifetime enrollment in the SBM program reasonable for defendant and entered the order. The court found lifetime SBM reasonable because defendant had been convicted of statutory rape of Cassie D. in Georgia, served eight years in prison, immediately absconded from parole upon his release, assumed a false

name, and moved in with his former victim and began sexually abusing her daughter. Defendant gave oral notice of appeal.

## C.    Motion for Appropriate Relief

During the pendency of his appeal, defendant filed a MAR with this Court on 24 August 2018. The motion claimed that A.M.D. had recanted on her trial testimony and included an affidavit to that effect allegedly written by A.M.D. On 15 October 2018, we remanded defendant's motion to the Clay County Superior Court with instructions to conduct an evidentiary hearing on the motion ("the MAR hearing") pursuant to *State v. Britt*, 320 N.C. 705, 715, 360 S.E.2d 660, 665 (1987), within sixty days.

Due to scheduling conflicts with the prosecuting attorney and the Clay County Superior Court's failure to hold a criminal session of court between the weeks of 3 September 2018 and 17 December 2018, defendant's hearing was not held until 30 April 2019, over eight months after filing his motion with this Court.

The MAR hearing was held before the Honorable Athena F. Brooks from 30 April to 3 May 2019. At the hearing, A.M.D. testified that she fabricated her accusations of sexual abuse against defendant at trial due to bribes and threats from Lora D. Defendant introduced a letter into evidence that was alleged to have been written by A.M.D. and left on her mother's desk in January of 2018, when A.M.D. was living with her father and stepmother. The letter made admissions consistent

with A.M.D.'s hearing testimony. Cassie D. also testified at the hearing that, prior to trial, A.M.D. had also told her that she was falsely accusing defendant due to threats and bribes from Lora D. Cassie D. further testified that she had regained emergency custody of her children after Lora D. allegedly hurt A.M.D. on several occasions.

The State produced and played several recordings of phone calls between Cassie D. and defendant during his incarceration, which took place from July 2017 to March 2019. Many of these conversations, including those prior to the alleged date of A.M.D.'s letter in January 2018, discussed the romance between Cassie D. and defendant and the potential for A.M.D. to provide a recantation to aid in his appeal. A child specialist investigator with the Clay County District Attorney's Office testified that she had been present when A.M.D. had been interviewed prior to trial, and the child never mentioned any concerns about Lora D.

In its order, the court recited the relevant testimony from trial and the hearing, including that: (a) A.M.D. testified at the hearing in much greater detail about the occasions in which she alleged defendant had abused her, including details such as the movie being watched, but denied that any abuse occurred on these occasions as she had stated at trial; (b) A.M.D. testified that she lied at trial because Lora D. threatened and bribed her; and (c) Holly D. gave testimony at trial to the same effect.

The court found that it was suspicious for A.M.D. to recall additional details at the hearing, many years further removed from the events in question. The court further noted that A.M.D.'s mother and defendant engaged in frequent telephone conversations regarding defendant's appeal, including how a recantation from A.M.D. would aid his appeal, both before and after A.M.D. allegedly wrote her mother a letter admitting she fabricated her accusations. The court found that it did not believe A.M.D.'s testimony regarding the notarization of her affidavit because her testimony on this matter changed between the two days of the hearing, after hearing her mother's testimony.

From these findings, the court in turn found that "the child was feeling some form of pressure to make these statements [at the hearing]." The court declined "to speculate as to whether this was self-induced or from an external source." Based upon this determination, the court concluded as a matter of law that it was "not satisfied that the testimony given by [A.M.D.] at the trial on this matter in December 2016 was false[,]" and thus a finding that "false testimony at the trial would [cause] a different result would not have been possible." Accordingly, the court denied defendant's MAR.

## II.    Discussion

On appeal, defendant argues that the trial court:  (a) erred in admitting impermissible hearsay that did not corroborate A.M.D.'s testimony; (b) plainly erred

in admitting testimony regarding his extradition from Puerto Rico and instructing the jury that this could be considered as evidence of flight; (c) erred in the calculation of defendant's prior record level; and (d) erred by ordering that defendant be subjected to lifetime SBM at the expiration of his active sentence. Furthermore, defendant argues that the court abused its discretion in its order denying his MAR. We address each argument in turn.

## A.     Allowing Prior Statement Testimony of Ms. Hester

Defendant first argues that the trial court erred in allowing Ms. Hester to testify to prior statements A.M.D. made to her. Defendant contends that these statements were inadmissible hearsay, rather than admissible prior statements corroborating a witness's trial testimony. We disagree.

"A trial court's determination that evidence is admissible as corroborative evidence is  reviewed for abuse of discretion." *State v. Cook*, 195 N.C. App. 230, 243, 672 S.E.2d 25, 33 (2009) (citation omitted). "Prior consistent statements of a witness are admissible as corroborative evidence even when the witness has not been impeached." *State v. Ramey*, 318 N.C. 457, 468, 349 S.E.2d 566, 573 (1986) (citation omitted). In *State v. Johnson*, we summarized the distinction between inadmissible hearsay and admissible prior corroborative statements as follows:

> Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801 (2007). . . .

- 10 -

> Statements properly offered to corroborate former statements of a witness are "not offered for their substantive truth and consequently [are] not hearsay." *State v. Levan*, 326 N.C. 155, 167, 388 S.E.2d 429, 435 (1990).

209 N.C. App. 682, 692, 706 S.E.2d 790, 797 (2011) (brackets in original).  We also

summarized the standard for determining whether a prior statement is corroborative:

> Corroborating statements are those statements that tend to strengthen; to add weight or credibility to a thing by additional and confirming facts or evidence.  Nevertheless, if the testimony offered in corroboration is generally consistent with the witness's testimony, slight variations will not render it inadmissible. . . . Such variations only affect the credibility of the evidence which is always for the jury. . . . [C]orroborative testimony may contain new or additional information when it tends to strengthen and add credibility to the testimony which it corroborates . . . .

*Id.* (internal quotation marks and citations omitted).

In the instant case, A.M.D. testified at trial that defendant touched the interior

and exterior of her vagina with his hands and fingers on numerous occasions at the

Ruby Falls house.  Three prior statements of A.M.D. were admitted to corroborate

her testimony.  The prior statements offered by Mr. Tucker and T.D. are unchallenged

on appeal.

Defendant only challenges A.M.D.'s prior statement to Ms. Hester.  Defendant

argues that, even with the limiting instruction, the trial court erred in allowing Ms.

Hester's testimony recounting A.M.D.'s prior statements related to fellatio, anal molestation, and the insertion of objects into A.M.D.'s private parts.

During her testimony, A.M.D. did not mention any such acts when asked when, where, and how defendant hurt her. A.M.D. did say that she only saw defendant's penis once when she went into the basement to wake him up, and stated that it did not touch her on that occasion. Thus, A.M.D.'s testimony only indirectly contradicts the challenged prior statement related to fellatio. Her testimony is silent regarding anal molestation and use of objects.

Accordingly, the instant case is different than those in which prior statements were held non-corroborative because they directly contradicted several aspects of a witness's testimony. *See, e.g., State v. Frogge*, 345 N.C. 614, 617, 481 S.E.2d 278, 279-80 (1997) (prior statements were not corroborative where: (a) witness testified that defendant procured a knife after victim hit him with metal bar, whereas prior statement indicated witness did not recall whether defendant or victim first wielded weapon; (b) witness testified that defendant went to party after murdering victims and returned to scene of crime and staged robbery, whereas prior statement indicated defendant staged robbery prior to leaving for party; and (c) witness testified that defendant did not tell him why he stabbed victim, whereas prior statement indicated that defendant told witness he stabbed victim because he hated her). Nor is it one in which the challenged prior statement is far removed from its original declarant. *See*

*State v. Stills*, 310 N.C. 410, 416, 312 S.E.2d 443, 447 (1984) (noting that, where prior statement offered to corroborate another corroborating witness was partially inconsistent with testimony of original declarant, "justify[ing] the admission into evidence of hearsay statements *three* or *four* times removed from the original declarant under the guise of corroborating the corroborative witnesses is unacceptable") (emphasis in original).

Here, A.M.D. did not confirm, deny, or speak of these additional acts in any manner during her testimony. Her testimony that she only saw defendant's penis once and it did not touch her on that occasion indirectly contradicts Ms. Hester's testimony regarding fellatio. However, the vast majority of A.M.D.'s prior statements offered by Ms. Hester conformed with A.M.D.'s testimony that defendant penetrated her vagina with his fingers on numerous occasions at the Ruby Falls house. The excerpts of A.M.D.'s prior statements which do not align with this account of events merely add detail on the differing nature of defendant's abuse of A.M.D.

In *State v. Ramey*, our Supreme Court found that a victim's prior statements were sufficiently similar to his trial testimony to be admitted for corroborative purposes, even though they added more detail to the account of abuse given at trial. 318 N.C. at 470, 349 S.E.2d at 574. The victim testified that the defendant first touched his penis when he was five years old and that defendant had done so more than five times. *Id.* In one of his prior statements, the victim had given this same

account of events, but added that the defendant would visit him at his home, buy him ice cream, and tell him not to tell anyone what happened. *Id.* at 469, 349 S.E.2d at 574. In another prior statement, the victim gave a consistent account of events but added that defendant had put both his mouth and hands on his penis. *Id.* at 470, 349 S.E.2d at 574. Our Supreme Court held that:

> [The victim's] testimony clearly indicated a course of continuing sexual abuse by the defendant. The victim's prior oral and written statements . . ., although including additional facts not referred to in his testimony, tended to strengthen and add credibility to his trial testimony. They were, therefore, admissible as corroborative evidence. The jury could not be allowed to consider this evidence for any other purpose, however, and whether it in fact corroborated the victim's testimony was, of course, a jury question.

*Id.* (internal citations omitted).

Similar to *Ramey*, here A.M.D.'s testimony clearly indicates a pattern of continuing abuse by defendant while her family lived at the Ruby Falls house, consisting of defendant's penetration of A.M.D.'s genitals with his fingers. A.M.D.'s prior statements offered by Ms. Hester substantially conform with A.M.D.'s testimony at trial, save for the addition of other forms of abuse. These statements were sufficiently similar to A.M.D.'s testimony for the trial court to allow the jury to decide their corroborative value for itself, after receiving a limiting instruction to that effect. Therefore, the trial court did not abuse its discretion.

Assuming *arguendo* that the trial court abused its discretion by admitting A.M.D.'s prior statements to Ms. Hester, defendant was not prejudiced thereby. The jury heard two other witnesses give accounts of A.M.D.'s prior statements that conformed with her testimony of abuse given at trial, without providing additional details. Furthermore, one of these witnesses was a disinterested medical professional. *See State v. Smith*, 315 N.C. 76, 99, 337 S.E.2d 833, 848 (1985) (finding corroborative testimony of disinterested rape task force volunteer likely to have greater influence on jury). Defendant has not shown that, without A.M.D.'s prior statements recounted by Ms. Hester, there is a reasonable possibility that the jury would have found A.M.D.'s trial testimony to lack credibility.

The State's brief attempts to further distinguish *Stills* from the instant case by stating that the trial court in *Stills* gave the jury no limiting instruction when it admitted allegedly corroborative, impermissible hearsay over objection. In *Stills*, our Supreme Court did find impermissible some allegedly corroborative statements to which the defendant did not object and the trial court provided no limiting instruction. 310 N.C. at 415, 312 S.E.2d at 446. Our Supreme Court was somewhat ambiguous in identifying the prior statements with which it took issue. However, a careful reading of the case reveals that the Court also found impermissible one allegedly corroborative statement to which the defendant did object, and the trial court provided an adequate limiting instruction. *Id.* at 413, 312 S.E.2d at 445-46.

B.    Testimony of Extradition and Instruction on Evidence of Flight

Defendant further argues that the trial court plainly erred by: (1) allowing Detective Ellis to testify regarding defendant's extradition back to North Carolina after his arrest in Puerto Rico, and (2) instructing the jury that this could be considered evidence of flight. Defendant concedes that he failed to preserve these issues at trial, and thus our review is limited to plain error.

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (alteration in original) (internal quotation marks and citations omitted).

1.    Testimony of Extradition

Defendant argues that the trial court plainly erred in allowing Detective Ellis to testify regarding defendant's apprehension and extradition from Puerto Rico. Defendant contends that Detective Ellis only learned of his extradition from conversations with the Marshals and the extradition paperwork, and therefore lacked personal knowledge to testify to this matter as required by N.C. Gen. Stat. § 8C-1, Rule 602 (2019). We disagree.

An evidentiary foundation for personal knowledge "may, but need not, consist of the testimony of the witness himself." *Id.* We agree with the State's position that "Detective Ellis's initiation of the involvement of the U.S. Marshals Service and direct oversight of the case as lead detective demonstrate personal knowledge sufficient to satisfy the requirements of . . . Rule 602. Detective Ellis had personal knowledge regarding the inability to locate [d]efendant after visiting all of his known residences since his release from prison in Georgia in 2008. Detective Ellis initiated the conversation with U.S. Marshals regarding assistance [in] locating [d]efendant." This constitutes sufficient personal knowledge to testify concerning defendant's extradition under Rule 602.

Assuming *arguendo* that the trial court erred in allowing this testimony, any such error did not have a probable impact on the jury's verdict. The jury also heard testimony that defendant subsequently escaped from the Clay County Detention Center and was found hiding in the attic of a nearby home. Thus, even without the challenged testimony, the jury heard evidence that defendant attempted to flee before he could be prosecuted for the alleged offenses. Defendant has thus failed to prove that the jury probably would have reached a different verdict without Detective Ellis's testimony on his extradition.

2.    Jury Instruction on Flight

Defendant argues that the trial court plainly erred by instructing the jury that his arrest and extradition from Puerto Rico could be considered evidence of flight indicative of guilt. Defendant maintains that the State did not produce evidence that he went to Puerto Rico to avoid apprehension for his crimes. We disagree.

"A trial judge is not required to instruct a jury on defendant's flight unless there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged. Mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension." *State v. Thompson*, 328 N.C. 477, 489-90, 402 S.E.2d 386, 392 (1991) (internal quotation marks and citations omitted).

Evidence that a defendant departed from his usual routine by subsequently leaving the area and staying in another town, county, or state may support an instruction on flight. *See State v. Allen*, 346 N.C. 731, 740-41, 488 S.E.2d 188, 193 (1997) (holding no plain error where defendant "drove away from the scene of the crime and was not apprehended until later that night in another county"); *State v. Shelly*, 181 N.C. App. 196, 209, 638 S.E.2d 516, 526 (2007) ("Defendant left the scene of the shooting and did not return home. Rather, he spent the night at the home of his cousin's girlfriend, an action that was not part of Defendant's normal pattern of

behavior and could be viewed as a step to avoid apprehension. Accordingly, the trial court did not err in instructing the jury on flight.").

Here, the jury heard testimony that defendant's normal routine at the time he learned of A.M.D.'s accusations involved residing in the basement of the Ruby Falls home. Immediately after A.M.D. made her accusations in June of 2012, defendant could be found at neither the Ruby Falls home nor any of his other prior known addresses. Nearly six months later in November of 2012, defendant was found and arrested in Puerto Rico. Defendant was nowhere to be found immediately after A.M.D. accused him of sexual abuse, and was apprehended several months later in a territory outside the continental United States. This evidence reasonably supports the State's theory that defendant fled to avoid apprehension for his crimes against A.M.D. Thus, the trial court did not err in instructing the jury on flight.

## C.    Sentencing

Next, defendant argues that the trial court erred in sentencing him by improperly calculating his prior record level and imposing lifetime SBM after the expiration of his active term of imprisonment. We address each argument in turn.

### 1.    Prior Record Calculation

Defendant contends that, in its calculation of his prior record level, the trial court erroneously determined that one of his prior convictions in Georgia was substantially similar to a Class B1 felony in North Carolina. We disagree.

a. <u>Standard of Review</u>

By default, prior felony convictions from other jurisdictions are treated as Class I felonies when calculating a defendant's prior record level. N.C. Gen. Stat. § 15A-1340.14(e) (2019). However, the prior felony conviction can be treated as a higher class of felony if the State proves by a preponderance of the evidence that it is "substantially similar" to a North Carolina felony of that class. *Id.* When determining substantial similarity, the trial court is tasked with "comparing the elements of [the] out-of-state and North Carolina offenses." *State v. Sanders*, 367 N.C. 716, 720, 766 S.E.2d 331, 334 (2014) (citations omitted). "[W]hether an out-of-state offense is substantially similar to a North Carolina offense is a question of law" that we review *de novo*. *State v. Hanton*, 175 N.C. App. 250, 254, 623 S.E.2d 600, 604 (2006). In so reviewing, we keep in mind that "the requirement set forth in N.C. Gen. Stat. § 15A-1340.14(e) is not that the statutory wording precisely match, but rather that the offense be 'substantially similar.'" *State v. Sapp*, 190 N.C. App. 698, 713, 661 S.E.2d 304, 312 (2008).

b. <u>Record Sufficient for Review</u>

In the instant case, the State failed to meet its burden of proof. While a copy of the Georgia statute under which defendant had been convicted was given to and reviewed by the trial court in making its determination, it was never introduced into evidence. Nonetheless, the State's failure to meet its evidentiary burden is harmless

where the record contains "sufficient information regarding an out-of-state conviction for this Court to determine if it is substantially similar to a North Carolina offense[.]" *State v. Henderson*, 201 N.C. App. 381, 388, 689 S.E.2d 462, 467 (2009).

As defendant concedes, such is the case here. The record evidence before the court during sentencing contained defendant's Georgia indictment and guilty plea. The relevant counts in the indictment alleged that defendant committed child molestation in violation of Ga. Code Ann. § 16-6-4 (2001) and statutory rape in violation of Ga. Code Ann. § 16-6-3 (2001) between October 1999 and October 2000. Moreover, the court's prior record level worksheet indicates that only the statutory rape offense was used to add nine points to the defendant's prior record level. The transcript reveals that the trial court and counsel for defendant and the State discussed whether the Georgia statute was substantially similar to North Carolina's statutory provision outlawing sexual intercourse with persons under sixteen years of age. Therefore, the record contains enough information for us to review the trial court's determination that the Georgia and North Carolina offenses were substantially similar.

c.     Substantial Similarity

The version of the Georgia statute in effect at the time of defendant's prior offense provides that "[a] person commits the offense of statutory rape when he or she engages in sexual intercourse with any person under the age of 16 years and not his

or her spouse[.]" Ga. Code Ann. § 16-6-3(a). The court determined this offense was substantially similar to N.C. Gen. Stat. § 14-27.25(a) (2015), which makes it a Class B1 felony "if the defendant engages in vaginal intercourse with another person who is 15 years of age or younger and the defendant is at least 12 years old and at least six years older than the person, except when the defendant is lawfully married to the person." Such conduct constitutes only a Class C felony where the defendant is between four and six years older than the victim. N.C. Gen. Stat. § 14-27.25(b).

### 1. Victim Age and Scope of Prohibited Conduct

Defendant maintains that the Georgia offense of statutory rape is not "substantially similar" to N.C. Gen. Stat. § 14-27.25(a), because Ga. Code Ann. § 16-6-3(a) "does not require any particular age difference between the two participants. Unlike its North Carolina counterparts, the Georgia statute applies equally to all [victims] under the age of 16 years, instead of drawing distinctions between victims under the age of 13 and 13, 14 and 15 year-old victims."

We find defendant's attempt to distinguish the Georgia offense from that of North Carolina based on distinctions between the ages of victims unpersuasive. Defendant's argument is based upon a prior version of our statutes that made sexual intercourse with minors under age 13 and those 13 to 15 years old distinct offenses, albeit both Class B1 felonies. *See* N.C. Gen. Stat. §§ 14-27.7A, 27.2(a) (2001). At the

time of defendant's sentencing, these two offenses had been consolidated into a single offense by N.C. Gen. Stat. § 14-27.25 (2015).

## 2.    Age Requirements for Offenders

However, defendant correctly notes that the North Carolina and Georgia statutes have differing age requirements for offenders. According to defendant, this puts the offenses beyond the ambit of substantial similarity.

In *State v. Bryant*, we held that the South Carolina offense of criminal sexual conduct with minors in the first degree, *see* S.C. Code Ann. § 16-3-655(1) (1996), was not substantially similar to the North Carolina offenses of statutory rape of a child by an adult and statutory sexual offense with a child by an adult, *see* N.C. Gen. Stat. §§ 14-27.23, 27.28 (2015). 255 N.C. App. 93, 100, 804 S.E.2d 563, 567-68 (2017). In reaching this conclusion, we reasoned that:

> these offenses are not substantially similar due to their disparate age requirements. Although both of the North Carolina statutes require that the offender be at least 18 years of age, a person of any age may violate South Carolina's statute. Moreover, North Carolina's statutes apply to victims under the age of 13 years, while South Carolina's statute protects victims who are less than eleven years of age. The North Carolina and South Carolina statutes thus apply to different offenders and different victims. Therefore, the offenses are not substantially similar.

*Id.* at 100, 804 S.E.2d at 568 (internal quotations marks, citations, and alterations omitted).

In the instant case, the relevant offenses of North Carolina and Georgia have disparate requirements concerning the difference in age between the victim and offender. The North Carolina statute can only be violated by the older of two participants in sexual intercourse, where at least one is below the age of consent. *See* N.C. Gen. Stat. § 14-27.25(a) (stating that a person has committed the Class B1 felony offense only if he "is at least six years older" than a person under 16 years old with whom he engages in vaginal intercourse). The Georgia statute can be violated by both the younger and older parties to sexual intercourse, where both are under the age of 16 and older than 13. *See* Ga. Code Ann. § 16-3-1 (2001) (setting 13 years as age of criminal responsibility).

Depending on the age of the offender and victim, conduct prohibited by the Georgia statute does not necessarily constitute the Class B1 felony offense in North Carolina. *Cf. Sapp*, 190 N.C. App. at 713, 661 S.E.2d at 312 (holding inverse proposition to suffice for finding of substantial similarity). There are several hypothetical combinations of victim and offender ages for which the same underlying action violates Ga. Code Ann. § 16-6-3 but does not constitute an offense, or only qualifies as a Class C felony, under N.C. Gen. Stat. § 14-27.25. For example, an offender engaging in sexual intercourse with a 13-year-old victim has committed the Georgia offense whether he is 13 or 19 years old, whereas the offender would not have

committed the Class B1 felony offense in North Carolina if he was any younger than 19 years old.

Nevertheless, we hold that *Bryant* does not compel a similar result in the instant case for several reasons. As an initial matter, an analysis of our precedent in applying N.C. Gen. Stat. § 15A-1340.14(e) reveals that *Bryant* represents an outlier in our case law on substantial similarity. Most cases in which our courts have found no substantial similarity between two offenses involved situations where one offense contained an additional, more distinct element than merely a differing age requirement. *See, e.g.*, *Sanders*, 367 N.C. at 719-21, 766 S.E.2d at 333-34 (holding North Carolina offense of "assault on a female" not substantially similar to Tennessee offense of "domestic assault" because the latter "does not require the victim to be female or the assailant to be male and of a certain age" and, unlike the former, could only occur inside the home); *State v. Foxworth*, No. COA14-693, 2015 WL 660792, at *3 (N.C. Ct. App. Feb. 17, 2015) (holding two attempted murder statutes not substantially similar where North Carolina offense required additional *mens rea* element of premeditation); *State v. Hogan*, 234 N.C. App. 218, 230, 758 S.E.2d 465, 474 (2014) (holding New Jersey offense of third-degree theft not substantially similar to North Carolina offense of misdemeanor larceny because "[t]here are many elements of third degree theft not found in misdemeanor larceny" and "[s]everal of these possible elements, such as theft from a person, would also make the larceny a

felony in North Carolina"); *Hanton*, 175 N.C. App. at 258-59, 623 S.E.2d at 606-607 (holding New York offense of second-degree assault not substantially similar to North Carolina offense of assault inflicting serious injury, due to lack of serious physical injury requirement).

Furthermore, we have overlooked differing statutory requirements far greater than age requirements in finding substantial similarity between two offenses. *See, e.g.*, *State v. Johnson*, No. COA16-1170, 2017 WL 2437001, at *3 (N.C. Ct. App. June 6, 2017) (holding North Carolina and Tennessee offenses of resisting arrest substantially similar despite Tennessee's additional requirement of "force," indicating it "is more serious than the same offense in North Carolina[.]"); *State v. Fortney*, 201 N.C. App. 662, 671, 687 S.E.2d 518, 525 (2010) (holding Virginia and North Carolina offenses prohibiting convicted felons' involvement with firearms substantially similar, despite Virginia statute only prohibiting knowing and intentional possession or transport and North Carolina statute's more extensive prohibition on purchase, ownership, possession, or having a firearm in custody, care, or control).

Having noted the aberrant nature of our holding in *Bryant*, we now turn to our chief consideration in holding the offenses substantially similar: "There may be . . . hypothetical scenarios which highlight the more nuanced differences between the two offenses. But the subtle distinctions do not override the almost inescapable

conclusion that both offenses criminalize essentially the same conduct . . . ." *State v. Riley*, 253 N.C. App. 819, 827, 802 S.E.2d 494, 500 (2017).

We have previously found an out-of-state felony sexual offense against a minor to be substantially similar to our own, *despite* semantic differences in the age requirements for the offender and victim. *See State v. Corey*, No. COA17-1031, 2018 WL 2642772 (N.C. Ct. App. June 5, 2018), *rev'd in part, vacated in part on other grounds*, 373 N.C. 225, 835 S.E.2d 830 (2019). In *Corey*, we held that two sexual offense statutes prohibiting essentially the same conduct with slightly different age requirements were substantially similar. *Id.* at *4. Michigan's offense of fourth-degree sexual misconduct required an offender at least 18 years old and five years older than a 13-, 14-, or 15-year-old victim. *Id.* at *3-4. The statute prohibited engaging in "sexual contact" between an offender and victim. *Id.* at *4 North Carolina's offense of taking indecent liberties with a child required that the offender be at least 16 years old and five years older than a victim under 18 years old. *Id.* (citing N.C. Gen. Stat. § 14-202.1 (2017)). The statute prohibited the taking of "immoral, improper, or indecent liberties with the child . . . for the purpose of . . . arousing sexual gratification." *Id.*

Despite the hypothetical scenarios in which an offender of a certain age would violate the North Carolina statute and not the Michigan statute, we agreed with the trial court that:

> [T]he statutes at issue are substantially similar because *the elements of the statutes target assailants that engage in similar conduct with similar victims*, i.e., assailants who engage in sexual conduct with children for the purpose of sexual arousal. All child victims who meet the age requirement for the Michigan offense of fourth-degree sexual conduct . . . would meet the age requirement and could be classified as victims under N.C. Gen Stat. § 14-202.1 (2017). Moreover, the Michigan statute and case law further defining the offense seeks to prevent actions by defendants against children which lead to or arouse sexual gratification. The same is true of our indecent liberties with a child statute. We therefore conclude that the offenses are substantially similar . . . .

*Id.* (emphasis added).

Although unpublished, we find our reasoning in *Corey* persuasive in the instant case. Both the North Carolina and Georgia statutes seek to protect persons under the age of 16 from engaging in sexual activity with older individuals. Any victim meeting the age requirement of the Georgia offense would meet the age requirement and could be classified as a victim under N.C. Gen. Stat. § 14-27.25.

Moreover, both statutes opt to levy greater punishment on older offenders with greater age discrepancies from their victims. Although it does so in a manner structurally different from our own, the Georgia statute stratifies the severity of punishment based on the age discrepancy between the offender and the victim. Offenders under 21 years old face a minimum punishment of imprisonment for one year, whereas offenders 21 years of age and older face a minimum punishment of imprisonment for ten years. Ga. Code Ann. § 16-6-3(b). The same conduct is only

punishable as a misdemeanor if the offender has an age difference of three years or fewer from a 14- or 15-year-old victim. *Id.*

Additionally, we note that defendant's indictment in the instant case reveals he would have been 36 years old when he committed the conduct underlying his Georgia conviction against a person under 16 years of age. Thus, defendant's conduct would constitute the Class B1 felony offense under N.C. Gen. Stat. § 14-27.25(a). Although not dispositive, we find this fact weighs against the various hypothetical technicalities defendant points to in arguing the offenses are dissimilar.

Both N.C. Gen. Stat. § 14-27.25 and Ga. Code Ann. § 16-6-3 seek to protect persons under age sixteen from those who would engage in sexual intercourse with them, and seek greater deterrence for offenders significantly older than their victims by punishing them more severely. Therefore, we hold that the trial court did not err in finding the two offenses substantially similar. The trial court properly treated defendant's prior conviction of the Georgia offense as a Class B1 felony for the purposes of calculating his prior record level.

## 2. Lifetime Satellite-Based Monitoring

Finally, defendant argues that the trial court erred by entering an order subjecting defendant to lifetime participation in the State's SBM program. Accepting *arguendo* the State's contention that defendant has failed to preserve this issue on appeal, we invoke N.C.R. App. P. 2 (2020) to assess the merits of defendant's

argument, which we find controlling. *See State v. Bursell*, 372 N.C. 196, 200-201, 827 S.E.2d 302, 305-306 (2019) (holding this Court erred in finding that defendant preserved constitutional challenge to lifetime SBM order, but permissively invoked Rule 2 in alternative to address issue).

a.  <u>Error</u>

An order requiring a defendant to participate in the State's lifetime SBM program per N.C. Gen. Stat. § 14-208.40A(c) (2019) effects a search triggering the Fourth Amendment's protection from unreasonable searches and seizures. *Grady v. North Carolina*, 575 U.S. at 308-309, 191 L. Ed. 2d at 461. This is a substantial right that warrants our discretionary invocation of Rule 2. *Bursell*, 372 N.C. at 200-201, 827 S.E.2d at 305-306.

We first note that defendant does not fall within the category of persons for whom our Supreme Court has ruled mandatory enrollment in the SBM program facially unconstitutional. *See State v. Grady*, 372 N.C. 509, 522, 831 S.E.2d 542, 553 (2019) (limiting holding that program was facially unconstitutional as to "individuals who are subject to mandatory lifetime SBM based solely on their status as a statutorily defined 'recidivist' who have completed their prison sentences and are no longer supervised by the State through probation, parole, or post-release supervision") (footnote omitted). While defendant does qualify as a recidivist, the trial court's SBM order also makes findings that defendant's convicted offense was

sexually violent, committed against a child, involved the physical, mental, or sexual abuse of a minor, and qualified as an aggravated offense under N.C. Gen. Stat. § 14-208.6(1a) (2019). *See* N.C. Gen. Stat. § 14-208.40A (2019) (listing these factors as warranting entry of order enrolling defendant in lifetime SBM program).

Before a trial court may order a defendant to participate in the SBM program for life, the State must prove that the SBM program is reasonable as applied to the defendant, considering the totality of the circumstances, the nature and extent to which it intrudes upon the defendant's reasonable privacy interests, and the extent to which it furthers legitimate governmental interests. *State v. Blue*, 246 N.C. App. 259, 264-65, 783 S.E.2d 524, 527 (2016) (clarifying burden of proof at *Grady* hearing lies with State) (citing *Grady*, 575 U.S. at 310, 191 L. Ed. 2d at 462).

The State concedes that the trial court had insufficient evidence before it to support the SBM order. In particular, the State notes that it presented no evidence on the burdens the program imposes upon participants or any data on the extent to which the program advances legitimate government interests. Rather, after taking notice of the facts and evidence adduced at trial, the trial court ignored the State's offer to proceed introducing evidence in a *Grady* hearing and summarily gave its reasons for finding lifetime enrollment in the SBM program reasonable. *See Blue*, 246 N.C. App. at 264-65, 783 S.E.2d at 527 (finding error where "the trial court simply acknowledged that SBM constitutes a search and summarily concluded it is

reasonable, stating that '[b]ased upon [the second-degree rape] conviction, and upon the file as a whole, lifetime satellite-based monitoring is reasonable and necessary and required by the statute.' ") (alterations in original). We agree with defendant and the State. The trial court thus erred by ordering that defendant participate in the SBM program for life.

b.       Remedy

Having found for defendant on the issue of error under *Grady* and its progeny, we must now determine the proper remedy.

We disagree with defendant's contention that reversal of the SBM order without remand is appropriate. This would be the proper remedy if the trial court had held a *Grady* hearing, and the State had simply failed to introduce enough evidence to meet its burden. *See, e.g.*, *State v. White*, No. COA 18-39, 2018 WL 4200979, at *8 (N.C. Ct. App. Sept. 4, 2018) ("[B]ecause the State presented insufficient evidence to meet its burden, the State is not entitled to a new SBM hearing for the purpose of giving it a 'second bite at the apple.' ") (citation omitted), *remanded*, 372 N.C. 726, 2019 N.C. LEXIS 1175 (2019); *State v. Dravis*, No. COA18-76, 2018 WL 4201041, at *4 (N.C. Ct. App. Sept. 4, 2018), *remanded*, 372 N.C. 721, 2019 N.C. LEXIS 1173 (2019); *State v. Greene*, 255 N.C. App. 780, 783-84, 806 S.E.2d 343, 345 (2017).

Here, the trial court entered a conclusory finding of reasonableness and did not afford the State an opportunity to satisfy its evidentiary burden, despite the State's repeated offers to proceed with a *Grady* hearing and introduce further evidence. Thus, the State has not yet had its "first bite of the apple," and vacatur of the SBM order with remand for an evidentiary hearing consistent with the most recent guidance from our Supreme Court in *State v. Grady*, 372 N.C. 509, 831 S.E.2d 542, is appropriate. *State v. White*, __ N.C. App. __, __, 820 S.E.2d 116, 122-23 (2018).

### D. Order Denying Motion for Appropriate Relief

Defendant argues that the trial court abused its discretion in its order denying his MAR requesting a new trial. Specifically, defendant contends that the order's findings of fact, taken as a whole, are insufficient to support the trial court's legal conclusions. We agree, and vacate and remand with instructions to enter an order containing sufficient findings of fact to address the issues raised by the motion and which the trial court believes to support its conclusion of law.

#### 1. Standard of Review

"When considering rulings on motions for appropriate relief, we review the trial court's order to determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *Frogge*, 359 N.C. at 240, 607 S.E.2d at 634 (internal quotation marks and citation omitted). The trial

- 33 -

court's findings of fact are binding on appeal if supported by competent evidence, and conclusions of law are reviewed *de novo*. *State v. Lutz*, 177 N.C. App. 140, 142, 628 S.E.2d 34, 35 (2006) (citation omitted).

Pursuant to a motion for appropriate relief,

> A defendant may be allowed a new trial on the basis of recanted testimony if:
>
> 1) the court is reasonably well satisfied that the testimony given by a material witness is false, and
>
> 2) there is a reasonable possibility that, had the false testimony not been admitted, a different result would have been reached at the trial.

*Britt*, 320 N.C. at 715, 360 S.E.2d at 665. The defendant "has the burden of proving by a preponderance of the evidence every fact essential to support the motion." N.C. Gen. Stat. § 15A-1420(c)(5) (2019).

## 2.    Application

Defendant challenges several findings of fact, arguing that they merely recite testimony and do not make necessary credibility determinations between conflicting testimony. We agree. Taken as a whole, the order's findings of fact do not resolve factual issues necessary to reach the trial court's conclusion of law.

Finding of fact 3 is, by itself, fatal to the order. This finding recites A.M.D.'s hearing testimony that she lied at trial due to threats and bribes from Lora D. and Holly D.'s trial testimony that A.M.D. made similar statements to her. Defendant

argues that this finding is deficient because it merely recites testimony without resolving any of the factual issues raised by this evidence: namely, whether the court believed it to be true. *See In re Green*, 67 N.C. App. 501, 505 n.1, 313 S.E.2d 193, 195 n.1 (1984) ("[V]erbatim recitations of the testimony . . . *do not* constitute *findings of fact* by the trial judge, because they do not reflect a conscious choice between the conflicting versions of the incident in question which emerged from all the evidence presented.") (emphasis in original). We agree.

> A trial court must make sufficient findings of fact and conclusions of law to allow the reviewing court to determine whether a judgment, and the legal conclusions that underlie it, represent a correct application of the law. Recitation of testimony is insufficient only where a material conflict actually exists on that particular issue, and does not resolve the conflicts in the evidence and actually find facts. A material conflict in the evidence exists when evidence presented by one party controverts evidence presented by an opposing party such that the outcome of the matter to be decided is likely to be affected.

*State v. Cody*, No. COA18-503, 2018 WL 6318427, at *8 (N.C. Ct. App. Dec. 4, 2018) (alterations, internal quotation marks, and citations omitted), *disc. rev. dismissed, cert. denied*, 372 N.C. 100, 824 S.E.2d 417 (2019).

The testimony at the trial and hearing clearly present a material conflict in the evidence. A.M.D. testified at trial that defendant sexually abused her. Holly D. testified at trial that A.M.D. told her she was lying due to threats and bribes from

Lora D. A.M.D. testified at the hearing that defendant did not sexually abuse her, and that she lied at trial due to Lora D.'s threats and bribes.

A determinative finding on whether A.M.D. had indeed lied in her trial testimony due to bribes and threats from Lora D. would cut to the core of the first prong of the *Britt* test. An affirmative finding on this issue would have compelled the court to find that it was reasonably satisfied that the testimony of a material witness was false. Moreover, the primary evidence against defendant consisted of A.M.D.'s testimony and the testimony of other witnesses recalling what she said to them on prior occasions. Thus, without A.M.D.'s trial testimony, the second prong of *Britt* would likely be satisfied because there is a strong possibility that defendant could not otherwise have been convicted. "[T]he outcome of the matter to be decided is likely to be affected" by the court's resolution of this conflict in the evidence, *State v. Baker*, 208 N.C. App. 376, 384, 702 S.E.2d 825, 831 (2010), therefore the trial court abused its discretion by failing to expressly find which version of events it believed to be true.

The dissent would find the trial court's order adequate under *Britt*, based on the court's findings noting its suspicion regarding the context in which A.M.D.'s recantation arose. The dissent does not explain how such findings can suffice to support the trial court's *Britt* conclusion without running afoul of our mandate to make findings resolving material conflicts in the evidence: in the present circumstances where "evidence presented by one party controverts evidence

presented by an opposing party such that the outcome of the matter to be decided is likely to be affected[,]" the trial court must make an ultimate determination regarding which version of events raised by the evidence it believes to be true. *Id.* The trial court's findings noting the suspect context in which A.M.D.'s recantation arose, however well-grounded they may be, are no substitute for a finding that directly resolves whether A.M.D. was indeed bribed and threatened to give false testimony at trial. This principle is far from an expansion of our Supreme Court's mandate in *Britt*. Rather, it arises from our general precedent addressing the sufficiency of findings of fact in any order, whether in the MAR context or otherwise.

Furthermore, the trial court's remaining findings of fact, viewed as a whole, do not adequately address other evidentiary issues raised at the MAR hearing. Findings of fact 1, 2, and 4 all contain recitations of A.M.D.'s testimony at the hearing, without expressly determining the veracity of this testimony. The court assesses the credibility of this testimony indirectly in conclusion of law 4, where it makes a finding that it "is convinced that the child was feeling some form of pressure to make these statements[,]" without "speculat[ing] as to whether this was self-induced or from an external source." "Internal pressure" is vague and could equally refer to either A.M.D.'s guilty conscience for falsely testifying at trial, or a desire to make her mother happy after observing her mother's romantic relationship with her incarcerated

abuser. The court must make some finding that sets forth its determination, rather than providing a vague reference as detailed above.

A court hearing an MAR must make findings in its order that are unambiguous and assess the credibility of the evidence on key issues presented by the motion. The court failed to do this in the instant case, and therefore abused its discretion in its order denying defendant's MAR. We therefore vacate the court's order denying defendant's motion and remand with instructions for the court to issue a new order[2] containing findings that resolve the factual issues presented by defendant's motion, the supporting affidavit, and the testimony at the hearing.

## III. Conclusion

For the foregoing reasons, we find no error in the evidentiary phase of defendant's trial, and vacate the trial court's orders enrolling defendant in the SBM program and denying defendant's MAR. We remand for entry of a new MAR order consistent with this opinion. If the court's new MAR order does not necessitate a new trial, we direct the court to conduct an evidentiary hearing on the reasonableness of subjecting defendant to the SBM program upon his release.

NO ERROR IN PART; VACATED IN PART AND REMANDED.

Chief Judge MCGEE concurs.

Judge BRYANT concurs in part and dissents in part in separate opinion.

---

[2] We request the court to exercise a degree of expediency not seen in its first treatment of defendant's motion in making these determinations.

No. COA17-1362 – State v. Graham

BRYANT, Judge, concurring in part, dissenting in part.

I fully concur in the majority opinion as it relates to the jury trial and the order on satellite-based monitoring. However, I disagree with the majority's opinion that the lower court abused its discretion by making findings of fact insufficient to support its conclusions of law and denying defendant's motion for appropriate relief (hereinafter "MAR"). Therefore, I respectfully dissent.

Following the evidentiary hearing on defendant's MAR, the lower court entered an order which contained the following:

FINDINGS OF FACT

1.      On December 5, 2016, a Jury of Clay County found the defendant Guilty of Statutory Sex Offense with a Child. At the trial of the matter [A.M.D.] testified as to various facts and occurrences during a relevant time frame during the year 2012. At the trial, she testified as to basic facts including details of the touching and acts of the defendant which could have constituted the offense. During this hearing on May 1, 2019, [A.M.D.] testified to many more details of the events, including the name of the movie being watched during the "couch" incident (Bobby and the Nutcracker); the book the defendant was reading her during the "bedroom" incident (The Opossum came a Knocking); the video game being played (Halo) during on the basement incidents.

2.      During the trial [A.M.D.] testified Roger (the defendant) was play asleep and when she tried to wake him up he pulled his privates out and when she went running upstairs to tell her mom that her mom giggled. During this hearing [A.M.D.] testified she went down and Roger was asleep and he wasn't getting up and [A.M.D.] went and told mom he wasn't waking up but not about privates and she did not remember going to bathroom [sic] to hide or being

scared. She testified the defendant didn't show his privates then or any other time. As to the other possible time frames of occurrences which were testified to at the trial, in this hearing [A.M.D.] denied any and all touching. She gave further details as to the names of the movie, book and video game but denials of any touching.

3.      When asked why [A.M.D.] lied during the trial she stated she was afraid of her step mother (Lora) as Lora had stated she would hurt or kill [A.M.D.]'s mom. Further the Step mother would get her things she wanted like a horse or get her toys if she testified and said these things. Also [A.M.D.] stated she didn't like liars and hated the lying during the trial. At the trial in December 2016, Holly Dempsey testified to something similar in relating a comment made to her by [A.M.D.] wherein she stated Lora said if she didn't say this she would kill her mom.

4.      Defendant's Exhibit 1 is a letter tha[t] [A.M.D.] says she wrote and left for her mother on her desk in January 2018 while [A.M.D.] was living with her dad. [A.M.D.] decided to write the letter because she knows her mom was "torn up" over the truth and not knowing the facts and [A.M.D.] wanted her to be happy again. Also, [A.M.D.] made comments about that's what love is about. This is the letter which led to the affidavit of [A.M.D.]. Upon questioning by both the State and the Defense counsel [A.M.D.] and her mother, Cassie, stated this letter was written and left in January 2018. Further they both stated it was not discussed between them until March 2018. *However when telephone calls were played by the State which were recorded between the defendant and Cassie reference is made to [A.M.D.] being willing to testify in court and getting an affidavit to send to the lawyer on December 6, 2017. Moreover, the defendant discusses whether [A.M.D.] is willing to testify in court about what she told Cassie. He tells Cassie to tell him about what [A.M.D.] said and to get an affidavit to send to the lawyer to help the appeals case.* He asks when [A.M.D.] is going to be with Cassie and away from Lora and the dad. On December 19,

2017 during another phone call between the defendant and Cassie, the defendant discussed getting [A.M.D.] in touch with a PI to get a statement from her, specifically Teresa Dean, and asks Cassie to look the number up. On January 12, 2018 during a phone call the defendant asks Cassie who else she had told of what [A.M.D.] said.

5.     During a phone call on May 7, 2019 [sic] the defendant is told by Cassie that Teresa Dean had been to talk to [A.M.D.]. The Defendant asks what was said and wanted Cassie to ask questions so she could tell him what was said during the interview.

6.     During a phone call on May 31, 2018 a voice the Court took to be [A.M.D.] called the defendant Dad to which he responds "aww" when Cassie says [A.M.D.] calls him that. This was overheard on the phone call when there was [sic] several voices clamoring to speak to the defendant on the phone among them Levi (the defendant's son with Cassie) Cassie and [A.M.D.]. There is then a discussion as to how long going to be until get [A.M.D.] gets into court. [sic]

7.     During a phone call on June 1, 2018 the defendant and Cassie discuss the MAR. The defendant explains where the testimony from [A.M.D.] comes in and how the MAR is the best chance because then the defendant can talk about the lawyer not doing stuff and [A.M.D.] recanting her testimony.

8.     The Affidavit (Defense Exhibit 2) was notarized at a bank in Georgia. During the first testimony of [A.M.D.] at this hearing she stated she signed it and the next day the lady put the stamp on it. The stamp being the notary seal. Cassie testified [A.M.D.] made some corrections to the affidavit and then they went to the bank and someone notarized it at the bank and then faxed it to the lawyer. When [A.M.D.] testified again two days later, she "remembered" she had signed the affidavit in front of the

lady and had shown her an ID, one from her school with her picture on it.

CONCLUSIONS OF LAW

. . . .

3.      The Court utilizing the standard as set out in <u>State v. Britt</u>, 320 N.C. 705, 360 S.E.2d 660 (1987); is charged with deciding the conditions. The first being if the Court is reasonably well satisfied that the testimony given by a material witness if false [sic] and the second being if there is a reasonable possibility that, had the false testimony not been admitted, a different result would have been reached at trial.

4.      *The Court is not satisfied that the testimony given by [A.M.D.] at the trial on this matter in December 2016 was false.* The Court concludes that the child gave surprisingly more details at this hearing than at the trial, some five to six years after the offenses. The trial was closer in time to the events and *it is suspicious that more details would be recalled as time elapses.* The Court heard the additional details the child gave during the affidavit and its signature during the course of this hearing between the two days of testimony and after witnessing the testimony of the mother. *The Court is unconvinced this is accurate testimony.* Further the details of the "recantation" and its use by the defendant as additional help for his appeal was discussed repeatedly between the defendant and the mother *prior* to the alleged time the letter (defendant's exhibit 1) was "left" by the child. The Court is convinced that the child was feeling some form of pressure to make these statements. The Court is not going to speculate as to whether this was self-induced or from an external source.

5.      The Court *not finding false testimony at the trial would find a different result would not have been possible.*

(emphasis added).

4

Our standard of review as to rulings on MARs is to determine whether the trial court's findings of fact are supported by the evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order. *See State v. Frogge*, 359 N.C. 228, 240, 607 S.E.2d 627, 634 (2005). This was acknowledged by the majority along with the well-known principle that "the trial court's findings of fact are *binding on appeal* if supported and the conclusions of law are reviewed *de novo*. *State v. Lutz*, 177 N.C. App. 140, 142, 628 S.E.2d 34, 35 (2006) (citation omitted)." It is also a well-known principle that "[w]here trial is by judge and not by jury, the trial court's findings of fact have the force and effect of a verdict by a jury and are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary." *In re Estate of Trogdon*, 330 N.C. 143, 147, 409 S.E.2d 897, 900 (1991) (citations omitted).

As noted by the majority, defendant has the burden of proof on an MAR. Defendant may be allowed a new trial on the basis of recanted testimony if:

1) the court is reasonably well satisfied that the testimony given by a material witness is false, and

2) there is a reasonable possibility that, had the false testimony not been admitted, a different result would have been reached at the trial.

*State v. Britt*, 320 N.C. 705, 715, 360 S.E.2d 660, 665 (1987).

Here, the lower court made a credibility determination based on testimony presented during the December 2016 trial and testimony presented during the May

2019 MAR hearing. The court determined that it "[was] not satisfied that the testimony given by [A.M.D.] at the trial on this matter in December 2016 was false." Further, the court concluded it was "unconvinced" the testimony at the MAR hearing was accurate.

The evidence presented during defendant's December 2016 trial showed that four years after she was abused at the age of eight, then twelve-year-old A.M.D. testified to acts of sexual abuse for which defendant was convicted. In May 2019, the hearing on defendant's MAR was conducted. Per the MAR court's finding of fact 1, the court noted the extent to which A.M.D. provided details at defendant's trial in 2016 versus the extent to which she provided details in 2019, regarding the circumstances surrounding a sex offense which did not occur. During defendant's 2016 trial, A.M.D. testified to basic facts which could have constituted a statutory sex offense with a child, while during the 2019 MAR hearing A.M.D. testified to the name of the movie that was playing during the "couch" incident, the book defendant was reading during the "bedroom" incident, and the video game being played during the "basement" incident, again testifying to facts surrounding incidents she later said did not occur.

Per finding of fact 2, A.M.D. recanted the testimony she gave during the 2016 trial—when she testified that defendant had "pulled his privates out" as she tried to wake him—and at the MAR hearing, she denied "any and all touching" by defendant.

6

In finding of fact 8, the court noted discrepancies in A.M.D.'s testimony, as well as that of her mother, Cassie, regarding how and when the affidavit A.M.D. signed in support of defendant's MAR was notarized. A.M.D. testified that the impetus for recanting her testimony, a letter she wrote to her mother—Defendant's Exhibit 1— was written and left for her mother in January 2018. A.M.D. knew "her mom was 'torn up' over the truth and not knowing the facts and [A.M.D.] wanted her [mother] to be happy again." Moreover, A.M.D. testified that she and her mother did not discuss the contents of the letter until March 2018. However, the MAR court found that defendant and A.M.D.'s mother, Cassie, were recorded on 6 December 2017, discussing with defendant A.M.D.'s willingness to testify in court and getting an affidavit to send to a lawyer. "[D]efendant discusse[d] whether [A.M.D.] [wa]s willing to testify in court about what she told Cassie. He t[old] Cassie to tell him about what [A.M.D.] said and to get an affidavit to send to the lawyer to help with the appeals case." On 19 December 2017, defendant and Cassie were recorded discussing getting A.M.D. in touch with a PI in order to get a statement. Again, there were clear discrepancies in the testimony of AMD and Cassie as to how, when, and perhaps where the affidavit of recantation was obtained.

In the court order denying defendant's MAR, the court acknowledged the test to grant defendant a new trial on the basis of recanted testimony as set forth in *Britt*,

320 N.C. 705, 360 S.E.2d 660. Therefore, it is clear the MAR court was aware the *Britt* test determined whether defendant's MAR could be granted.

The majority reverses the lower court order solely on the basis that the MAR court did not specifically state whether it found A.M.D.'s 2019 MAR hearing testimony that she was threatened and bribed to submit false testimony during defendant's 2016 trial to be true or false. The majority states that finding of fact 3 is, by itself, fatal to the order because the "finding recites A.M.D.'s hearing testimony that she lied at trial due to threats and bribes from Lora D." The majority accepts defendant's argument that the MAR court did not resolve the factual issue raised by that evidence. On the other hand, the majority does not accept that the MAR court did just what *Britt* requires as a first step: determine whether "the court is reasonably well satisfied that the testimony given by a material witness is false[.]" *Britt*, 320 N.C. at 715, 360 S.E.2d at 665.

What the majority is interposing is an expansion of the *Britt* test: a court hearing a MAR "must make findings in its order that are unambiguous and assess the credibility of the evidence on key issues presented by the motion." Here, during the MAR hearing, the witness recanted the bare bones of her trial testimony. But upon hearing the evidence, the lower court clearly had serious concerns regarding the circumstances and sequence of events that gave rise to the recantation by the witness—a minor child—as well as the pressure imposed ("either self-induced or from

an external source") upon that recanting witness which may have affected her veracity. As such, the court was "unconvinced" the recanting witness's testimony given during the 2019 MAR hearing was "accurate," and therefore, in accordance with *Britt*, the MAR court "[wa]s not satisfied that the testimony given by [A.M.D.] at trial on this matter in December 2016 was false."

The lower court's order was sufficient to satisfy the *Britt* test and denying defendant's MAR was not an abuse of discretion. Defendant merely failed to meet his burden of proof. It is not this Court's responsibility to use a test created by defendant that would require a lower court to make findings of fact on what <u>defendant</u> considers the critical issue. And I urge the majority not to adopt such an unsupportable position.

I will note that going forward, more specificity in the strength of a trial court's findings of fact and conclusions of law is always appreciated by our appellate courts. However, I disagree that, because we do not have what defendant may consider a more perfect order, the order we do have, which makes appropriate findings of fact and conclusions of law pursuant to the *Britt* rule, should be vacated.

For these reasons, I would uphold the lower court's order denying defendant's MAR.